John H. Gomez (SBN 171485)
**GOMEZ TRIAL ATTORNEYS**
655 West Broadway, Suite 1700
San Diego, California 92101
Tel:  (619) 237-3490
Fax:  (619) 237-3496
*john@thegomezfirm.com*

Kenneth M. Suggs*
Gerald D. Jowers, Jr.*
Mathew M. White*
**JANET, JANET & SUGGS, LLC**
801 Gervais St., Suite B
Columbia, SC 29201
Tel:  (803) 726-0050
Fax:  (803) 727-1059
*Ksuggs@JJSjustice.com*
*Gjowers@JJSjustice.com*
*Mwhite@JJSjustice.com*

*Attorneys for Plaintiffs*

*(\*Pro Hac Vice Applications Pending)*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| O.S.M., a minor, by and through his mother, KIARA BRIGHT MCKNIGHT, and KIARA BRIGHT MCKNIGHT, individually,<br><br>                                    Plaintiffs,<br><br>    v.<br><br>UNITED STATES OF AMERICA,<br><br>                                    Defendant. | Case No.: **'21CV0786 GPC DEB**<br><br>**COMPLAINT** |

COMES NOW O.S.M., a minor, by and through his mother, Kiara Bright McKnight, and Kiara Bright McKnight, individually, and together file this Complaint against the United States of America and, in support of his causes of action, would respectfully show the Court the following:

## JURISDICTION, PARTIES AND VENUE

1. This is a medical negligence action brought under the Federal Tort Claims Act for severe and permanent injuries arising out of negligent acts and/or omissions of employees, actual and/or apparent agents, servants, or representatives of the United States while acting within the course and scope of their employment, actual and/or apparent agency, servitude or representative capacity. Under circumstances where the United States of America, if a private person, would be liable to the Plaintiffs under the laws of the State of California, where the acts and/or omissions occurred. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §1346(b).

2. At all times relevant to these matters, the employees, actual and/or apparent agents, servants, representatives, or contractors of the United States were subject to the United States' right to control, including substantial supervision and direct over their day-to-day activities.

3. The Plaintiffs, O.S.M., a minor, and his mother, Kiara Bright McKnight, are individuals residing in Hephzibah, Georgia.

4. The United States of America is a Defendant.

5. At all times relevant to the Complaint, the Defendant, the United States of America was the employer of health care providers who provided care and treatment to Kiara Bright McKnight and O.S.M. when they were admitted to Naval Medical Center San Diego.

6. Defendant, United States of America, may be served with process in accordance with Rule 4(i) of the Federal Rules of Civil Procedure by serving a copy of the Summons and Complaint, by certified mail, return receipt requested, on Randy S. Grossman, United States Attorney for the Southern District of California at 880 Front

Street, Room 6293, San Diego, California 92101, to the attention of the civil process clerk; by serving a copy of the Summons and Complaint on Attorney General of the United States of America, Merrick B. Garland, by certified mail, return receipt requested, at the U.S. Attorney General's Office, 950 Pennsylvania Avenue, N.W., Washington, D.C. 20530-00001, to the attention of the Civil Division; and by serving a copy of the Summons and Complaint, by certified mail, return receipt requested, on the Department of the Navy, office of the Judge Advocate General, Tort Claims Unit Norfolk, 9620 Maryland Avenue, Suite 205, Norfolk, VA 23511-2949.

7. Venue is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. §1391(a)(1), (b)(2), (c), and (e) as the United States is a Defendant and because all or part of the cause of action accrued in this District.

## LIABILITY OF THE UNITED STATES OF AMERICA

8. This action is commenced and prosecuted against the United States of America pursuant to and in compliance with Title 28 U.S.C. §§2671-2680, commonly referred to as the "Federal Tort Claims Act." Liability of the United States is predicated specifically on Title 28 U.S.C. §§1346(b)(1) and 2674 because the personal injuries and resulting damages of which complaint is made, were proximately caused by the negligence, wrongful acts and/or omissions of the employees, actual and/or apparent agents, servants, representatives or contractors of the United States, at Naval Medical Center San Diego, while acting within the scope of their employment, actual and/or apparent agency, servitude, representative and/or contractor capacity under circumstances where the United States, if a private person, would be liable to the Plaintiff in the same manner and to the same extent as a private individual under the laws of the State of California.

9. The United States Navy is an agency of the United States of America. The United States of America, Defendant, through its agent, the United States Navy, at all times material hereto, owned, operated and controlled the health care facility known as Naval Medical Center San Diego, and through its agency, the United States Navy, staffed the health care facility with actual and/or apparent agents, servants, employees, representatives

and/or contractors.

## JURISDICTIONAL PREREQUISITES

10. On August 19, 2020, Plaintiffs, through counsel retained on February 2, 2020, submitted administrative claim Forms 95 to the appropriate claims officer for the United States Navy alleging injuries occurring on or about August 28-30, 2018. The Forms 95 were received by the Department of the Navy, Office of the Judge Advocate General on August 20, 2020, as acknowledged by Crystal A. Bowe, in a letter dated August 25, 2020.

11. The Attorney Advisor from Department of the Navy subsequently communicated an interest in working toward settlement. Thereafter the Parties undertook exchange and review of the medical records from Naval Medical Center San Diego, and the minor Plaintiff's subsequent treatment records for care received after leaving Naval Medical Center San Diego. As of this date, no mutually acceptable settlement has been agreed upon. Further, as of this date, a letter of denial of said claim has not been received, but more than six (6) months have passed, and the Plaintiffs do hereby exercise their option of considering that the claim is denied. Plaintiffs have complied with all jurisdictional prerequisites and conditions precedent to commencement and prosecution of this litigation.

## FACTS

12. This is a medical negligence action arising out of the negligent induction of labor of Kiara Bright McKnight commencing on August 28, 2018 and ending with the delivery of O.S.M. in a severely depressed condition having suffered severe, disabling and permanent brain damage because the medical professionals caring for him: 1) ignored obvious signs of fetal distress on the fetal monitoring strips; 2) mismanaged the administration of Pitocin; 3) failed to respond to the signs of fetal distress with appropriate intrauterine resuscitative measures; 4) failed to appreciate the significance of, and/or act upon, worrisome findings in the fetal heart tracings; 5) failed to properly train and supervise the health care providers in caring for patients with abnormal fetal heart rate tracings; 6) failed to have and follow safe practices in monitoring and reporting signs and symptoms of fetal intolerance of labor; 7) failed to timely perform a C/Section on Ms.

McKnight; 8) failed to establish and/or follow appropriate policies, procedures and practices to address properly the needs of patients such as Ms. McKnight and O.S.M..; and 9) otherwise failed to adhere to the applicable standards of care.

13.  Kiara Bright McKnight presented to Naval Medical Center San Diego, labor and delivery, on August 28, 2018 at 1833 for induction of labor at 37 5/7 weeks gestation secondary to gestational hypertension.

14.  A cervical exam at the time of admission found that she was not dilated, 0-30% effaced, and that her baby was in the -3 station. At the time of admission, she showed no signs or symptoms of preeclampsia. At that time, the plan was to administer Cytotec for cervical ripening and consider a foley bulb for further ripening, if needed.

15.  Ms. McKnight was placed on an electronic fetal monitor. An electronic fetal monitor records the mother's contractions and the fetal heart rate. The fetus's heart rate and the mother's contractions are printed on a continuous strip of paper. The purpose of monitoring the fetal heart rate during labor is to identify fetuses at risk for injury due to inadequate oxygenation. Initially, O.S.M.'s fetal heart rate patterns were reassuring at Category I. Reassuring, or Category I, fetal heart rate patterns indicate a fetus that is adequately oxygenated and tolerating labor.

16.  Fetal heart rate patterns are described in terms of Category I, Category II, or Category III. Category I fetal heart rate patterns are normal. Category III fetal heart rate patterns are abnormal and suggestive of a fetus that is at risk for injury due to inadequate oxygenation. Category II fetal heart rate patterns are indeterminate.

17.  At 1922, Dr. Spies placed Cytotec for cervical ripening.

18.  A vaginal exam at 2333 found that Ms. McKnight's cervix was 1 cm dilated, 75% effaced, and that her baby was at the -2 station.

19.  The fetal heart rate patterns to this time and until approximately 0200 on August 29, 2918 were generally reassuring.

20.  Beginning at approximately 0200, there was a change in the fetal heart rate patterns. At that time a pattern of late and variable decelerations began. Late decelerations

are associated with utero-placental insufficiency. Variable decelerations are associated with umbilical cord compression. Both types of decelerations are indicative of a disruption in the delivery of oxygen and blood to the fetus.

21. At 0247, Dr. Gillis, checked Ms. McKnight's cervix. At that time, her cervix was found to be 5 cm dilated, 75% effaced, and her baby was at the -2 station. She was still remote from delivery.

22. While Dr. Gillis was in the room, the nurses turned Ms. McKnight to her left side. This is an intrauterine resuscitative measure undertaken to attempt to improve fetal oxygenation and correct the fetal heart rate decelerations.

23. At 0303, Dr. Gillis ruptured Ms. McKnight's membranes. According to the records, thin meconium stained fluid was returned. Meconium is fetal stool. The release of meconium during labor can be a sign of fetal stress.

24. At 0305 Dr. Gillis placed a fetal scalp electrode and intrauterine pressure catheter. These devices allow more accurate readings of the maternal contractions and fetal heart rate.

25. At 0400 and thereafter, the fetal heart rate variability was minimal. Minimal fetal heart rate variability is associated with fetal stress and/or reduced oxygenation or blood flow to the fetus.

26. At 0524, Dr. Gillis checked Ms. McKnight's cervix and found that she was just 6cm dilated, 90% effaced, and her baby was at the -1 station.

27. The nurses noted that Ms. McKnight's urine output was low, a potential sign of preeclampsia.

28. At 0800 Ms. McKnight was started on Magnesium Sulfate, a medication given in response to signs of preeclampsia and/or high blood pressure. At the same time she was given a fluid bolus.

29. A cervical exam at 0834 found that Ms. McKnight's cervix was still just 6cm dilated, 90% effaced, and her baby was at the -2 station.

30. At 0838, Ms. McKnight was given supplemental oxygen by facemask, turned

to her right side, and given another fluid bolus. All of these interventions are intended to increase fetal oxygenation and correct fetal heart rate decelerations and/or reduced fetal heart rate variability.

31. At around 0900, Dr. Spies gave the order to begin administering Pitocin. Pitocin is a medication that stimulates the uterus to contract.

32. The Pitocin infusion began at 0935.

33. A cervical exam at 1044 by Dr. Spies found that Ms. McKnight was still just 6cm dilated, 90% effaced and her baby was at the -1 station.

34. The Pitocin was increased to 3 mu/min.

35. At 1051, the nurses reapplied the facemask oxygen.

36. At 1121 the Pitocin was increased to 5 mu/min. The Pitocin was increased again at 1205 to 7 mu/min.

37. At around 1258 the nurses' notes indicate the presence of late fetal heart rate decelerations and that Ms. McKnight was receiving supplemental oxygen by facemask.

38. At 1311 the Pitocin was increased to 11 mu/min.

39. At around 1424, Dr. Stortz was notified of the presence of minimal fetal heart rate variability. At 1427, Dr. Stortz was at Ms. McKnight's bedside. A cervical exam found that Ms. Mcknight was then 9.5 cm dilated, 100% effaced, and her baby was at the -1 station.

40. At 1445 the Pitocin was increased to 13 mu/min. At 1526 the Pitocin was again increased to 15 mu/min.

41. The nurses' notes indicate that at 1532 Dr. Stortz was notified of minimal fetal heart rate variability and Ms. McKnight's low urine output.

42. At 1534, Dr. O'Neill was at bedside. According to the notes, Dr. O'Neill was aware of the minimal fetal heart rate variability. Dr. O'Neill checked Ms. McKnight's cervix and found that she was fully dilated.

43. At around 1537 Ms. McKnight began pushing. The Pitocin continued at 15 mu/min and she continued to receive supplemental oxygen by facemask.

44. At 1638, the Pitocin was increased to 17 mu/min.

45. Despite the fact that Ms. McKnight was completely dilated and her contractions were adequate, Dr. O'Neill gave the order to allow the Pitocin to be increased to up to 30 mu/min.

46. At 1708 the Pitocin was increased to 19 mu/min. The facemask oxygen continued.

47. Nurses' notes at 1715 indicate the presence of late and variable fetal heart rate decelerations and that Dr. O'Neill was aware.

48. At 1745 the Pitocin was increased to 21. A note at 1800 states that Dr. O'Neill instructed the nurses to continue to increase the Pitocin.

49. At 1827 the Pitocin was increased to 23 mu/min.

50. At 1830, Dr. O'Neill was at bedside. By this time, Ms. McKnight had been pushing for 3 hours, had been continuously receiving supplemental oxygen by facemask, and the nurses had written notes in the records indicating concerns about the fetal heart rate patterns.

51. At 1945, Ms. McKnight was still pushing and still receiving Pitocin. By that time, a pattern of repetitive decelerations with minimal variability had clearly been established.

52. According to the records, at 2004 Dr. Gills was at bedside, and then at 2017 Dr. O'Neill was reported to be at bedside. During this time, the repetitive decelerations continued and the fetal heart rate variability was diminished.

53. O.S.M. was delivered, belatedly, at 2055, after 5 hours and 20 minutes of pushing. At delivery, O.S.M. was depressed. His Apgar scores, assessments of fetal well-being at 1, 5, and 10 minutes of life were 2, 4, and 7. He required resuscitation with positive pressure ventilation and supplemental oxygen. He did not have sustained respirations until 8 minutes of life.

54. O.S.M. was transferred to the neonatal intensive care unit (NICU).

55. At approximately four hours of life O.S.M. was observed to be having unusual

repetitive movements that were suspicious for seizures. At nine hours of life, he was noted to be having clear seizure activity and was started on Phenobarbital.

56. Blood gases after delivery were consistent with metabolic acidosis.

57. Despite O.S.M.'s depression at birth, his metabolic acidosis, and early onset seizures, he was not started on brain cooling therapy, the only treatment for brain injury due to hypoxia and ischemia.

58. MRI's of O.S.M.'s brain showed evidence of hypoxic ischemic injury of the acute profound and partial prolonged patterns of injury. A hypoxic ischemic injury is an injury caused by inadequate oxygen and/or blood supply to the brain.

59. O.S.M.'s course in the NICU was consistent with hypoxic ischemic encephalopathy. Hypoxic Ischemic Encephalopathy is a term for abnormal neurologic status due to inadequate oxygen and/or blood flow to the brain.

60. Other potential causes of O.S.M.'s brain injury and neurologic disorder, such as infection and metabolic disorders, were investigated and ruled out.

61. O.S.M. was discharged on September 16, 2018.

62. Today, O.S.M. is two years old. He has cerebral palsy, developmental delays, a seizure disorder, and other injuries and disabilities related to his brain injury. He has required, and will require throughout his life extraordinary medical care, therapies, attendant care, medications, and equipment. O.S.M. has in the past and will continue throughout his lifetime to suffer physical pain and suffering, mental and emotional pain, suffering, and anguish and loss of enjoyment of life. Further, O.S.M. is and will always be permanently disabled and thus has lost his entire earning capacity and a lifetime of wages.

63. Kiara McKnight, as a result of the injuries to her child, has in the past and will continue in the future to suffer mental and emotional anguish, loss of consortium, and will be forced to spend great sums for medical care, adaptive housing, transportation and equipment, therapies, attendant care and assistance with all activities of daily living for O.S.M.

///

## CLAIM FOR NEGLIGENCE OF DEFENDANT

64. The Defendant, the United States of America, by and through its agents, apparent agents, employees, servants, representatives, and contractors, owed Kiara McKnight and O.S.M. the duty to exercise that degree of care and skill which reasonably competent healthcare providers would have exercised under the same or similar circumstances.

65. The Defendant, the United States of America, by and through its agents, apparent agents, employees, servants, representatives, and contractors, undertook that duty to provide proper medical care and treatment to Kiara McKnight and O.S.M., with the level of care, skill, and treatment that is recognized as acceptable and appropriate by reasonably prudent health care providers under the same or similar circumstances.

66. The Defendant, the United States of America, by and through its agents, apparent agents, employees, servants, representatives, and contractors, while acting at all times relevant within the scope of their actual and/or apparent agency, employment, service representative and/or contractor capacity, failed to act as reasonably competent like Defendants would have acted under the same or similar circumstances, breached their duty to Kiara McKnight and O.S.M., violated the applicable standards of care, and were negligent by engaging in at least the following acts or omissions, which deviated from and fell below the accepted standards of medical care and treatment in at least the following ways:

   a. negligently ignored obvious signs of fetal distress on the fetal monitoring strips;
   b. negligently mismanaged the administration of Pitocin;
   c. negligently failed to respond to signs of fetal distress and uterine hypertonous with appropriate intra-uterine resuscitative measures;
   d. negligently failed to appreciate the significance of, and/or act upon, worrisome findings in the fetal heart tracings;

  e. negligently failed to properly train and supervise the health care providers in caring for patients with abnormal fetal heart rate tracings;

  f. negligently failed to have and follow safe practices in monitoring and reporting signs and symptoms of fetal intolerance of labor;

  g. negligently failed to timely perform a C/Section on Mrs. McKnight;

  h. negligently failed to establish and/or follow appropriate policies, procedures and practices to address properly the needs of patients such as Mrs. McKnight and O.S.M.;

  j. negligently failed to instigate the chain of command;

  k. otherwise negligently failed to adhere to the applicable standards of care.

67. As a direct and proximate result of Defendant's acts and/or omissions, by and through its agents, apparent agents, employees, servants, representatives, and contractors, caring for Kiara McKnight and O.S.M., while acting at all times relevant within the scope of their actual and/or apparent agency, employment, service representative and/or contractor capacity, as set forth above, and due to no fault of the Plaintiffs, O.S.M. has sustained permanent brain damage with significant physical, mental, emotional, social and economic limitations and effects. The damages sustained by O.S.M. include, but are not limited to the following:

  a. physical pain and mental anguish sustained in the past and that will continue in the future;

  b. disfigurement sustained in the past and that will continue in the future;

  c. physical impairment sustained in the past and that will continue in the future;

  d. mental impairment sustained in the past and that will continue in the future;

  e. loss of earning capacity that will be incurred after O.S.M. reaches the age of 18;

  f. medical, nursing, therapy, attendant care, rehabilitative care, and assistance with activities of daily living that will be incurred after O.S.M. reaches the age of 18;

  g. special education expenses that will be incurred after O.S.M. reaches the age of 18;

  h. special adaptive living expenses including housing, transportation, and medical and therapeutic devices/products that will be incurred after O.S.M. reaches the age of 18;

  i. loss of consortium with his parents, Kiara Bright McKnight and Stepfon McKnight.

68. As a direct and proximate result if the Defendant's acts and/or omissions, by and through its agents, apparent agents, employees, servants, representatives, and contractors caring for Kiara Bright McKnight and O.S.M., while acting at all times within the scope of their actual and/or apparent agency, employment, service representative and/or contractor capacity, as set forth above, and due to no fault of the Plaintiffs, Kiara Bright McKnight seeks to recover the economic losses incurred on O.S.M.'s behalf until he reaches the age of majority. Those damages include, but are not limited to the following:

  a. medical, nursing, therapy, attendant care, assistance with activities of daily living and rehabilitative expenses incurred in the past and that will be incurred in the future until O.S.M. reaches the age of 18;

  b. Special educational expenses for O.S.M. incurred in the past and that will be incurred in the future until O.S.M. reaches the age of 18;

  c. special adaptive living expenses including housing, transportation, and medical and therapeutic devices/products incurred in the past and that will be incurred until O.S.M. reaches the age of 18;

  d. the reasonable value of the attendant care provided to O.S.M., on account of his disabilities, by Kiara Bright McKnight in the past and through the date of trial;

  e. loss of household services of O.S.M.; and

  f. out of pocket expenses.

## PRAYER FOR RELIEF

69. WHEREFORE, Plaintiffs respectfully request that this case proceed to trial, and that Plaintiff's recover a judgment of and from the Defendant for actual damages in such an amount as the evidence may show and the trier of fact determine to be proper, post-judgment interest, costs, and all other and further relief to which the Plaintiffs may show themselves to be justly entitled.

Dated: April 21, 2021      Respectfully submitted,

               /s/ *John H. Gomez*
              John H. Gomez
              **GOMEZ TRIAL ATTORNEYS**

              Kenneth M. Suggs*
              Gerald D. Jowers, Jr.*
              Mathew M. White*
              **JANET, JANET & SUGGS, LLC**
              801 Gervais St., Suite B
              Columbia, SC 29201
              Tel: (803) 726-0050
              Fax: (803) 727-1059
              *Ksuggs@JJSjustice.com*
              *Gjowers@JJSjustice.com*
              *Mwhite@JJSjustice.com*

              *Attorneys for Plaintiffs*

              *Pro Hac Vice Applications Pending*